**2026 UT App 116**

## THE UTAH COURT OF APPEALS

STEVEN HUTCHINGS,
Appellant,
*v.*
CEDAR POINTE HOMES LLC AND TRENDLINE GROUP LLC,
Appellees.

Opinion
No. 20250034-CA
Filed August 6, 2026

Fifth District Court, St. George Department
The Honorable Eric Gentry
No. 230500456

Erik A. Olson and Connor B. Arrington,
Attorneys for Appellant

Seth D. Needs and David W. Hunter,
Attorneys for Appellees

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1　Steven Hutchings exchanged emails with a representative of Cedar Pointe Homes LLC and Trendline Group LLC (collectively, Appellees) regarding the potential purchase of two lots and two custom to-be-built homes. For each lot, Hutchings subsequently executed a lot reservation agreement (LRA) and paid a deposit. Hutchings also participated in the design process for each home. For one lot, a real estate purchase contract (REPC) was executed, construction proceeded, and the sale closed. But for the other lot, before a REPC was signed, Appellees named a price significantly higher than that identified in the early emails exchanged between the parties. Hutchings refused to sign the REPC, and Appellees returned Hutchings's deposit for that lot.

¶2     Hutchings sued, asserting claims of breach of contract, unjust enrichment, promissory estoppel, and equitable estoppel. Appellees moved for summary judgment on these claims, which the district court granted. Hutchings now appeals. We determine that no contract was formed for the second lot and that the partial-performance exception to the statute of frauds does not apply. We therefore affirm the district court's grant of summary judgment on Hutchings's breach of contract claim. We also affirm the district court's grant of summary judgment on Hutchings's promissory and equitable estoppel claims. However, we conclude that summary judgment was inappropriate regarding Hutchings's unjust enrichment claim, and we reverse for a limited remand on that claim.

BACKGROUND[1]

*The Parties Communicate About Lots and Homes*

¶3     In 2020, Hutchings began communicating with Appellees about a planned community development in Washington County. On June 4, 2020, Appellees' representative sent Hutchings an email saying, verbatim:

> We enjoyed meeting with you guys the other day. In keeping with our desire to build beautiful and desirable homes on the Lagoon front, we need to maximize and keep the square footage in the 5k ft2 area on these two lots. I think with adding the extra bedrooms and entertaining areas you desire, it's a

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (cleaned up).

necessity as well. We are willing to work with you on customization of course.

With regard to the Desert Color lots we propose the following:

Lot 130 (smaller of the two lots) approx. 5000 ft2 $1,200,000.00

Lot 131 (larger of the two lots) approx.5500 ft2 $1,320,000.00

These prices would not include pools (we would however would do those at cost for you) likely with Cutting Edge Pools LLC

These base prices would include essentially what you saw in the house we toured. Thermador or equivalent appliances , High end custom Cabinetry, Aluminum windows etc..

We can get a more detailed list to you as we move forward.

¶4     That same day, Hutchings responded, verbatim:

Thanks for the info. We are very interested. Can you send the plat with dimensions so we understand that as well? Also. Assuming rooftop patio, fire pit, landscaping would be part of this price as well. We just need to add 50–60k for the pool depending on size, layout, etc.

¶5     The parties exchanged additional emails, including one on June 16, 2020, wherein Hutchings asked if he could be sent "a list of items included." On June 17, 2020, Hutchings emailed Appellees a partially completed REPC that stated it was for "the

purchase of a new [r]esidence . . . at: Lot 131." It listed a purchase price of $1,200,000 in one place and a purchase price of $1,250,000 in another and said, "The Purchase Price may be increased if additional costs are incurred for any Change Orders . . . ." Attached to the partially completed REPC was an addendum indicating that it was for "the [p]roperty located at Lot 130."

¶6 Somewhere around this time, Appellees "informed Hutchings that they had a particular process that they followed to formalize sales and begin construction," which involved "completing the design process, obtaining specific bids for construction costs, and finalizing those costs in a REPC."

*The Parties Execute LRAs for Lots 130 and 131*

¶7 On July 11, 2020, the parties executed an LRA for Lot 130 and another for Lot 131. Each LRA "acknowledge[d] receipt of a deposit" of $10,000 as consideration for Appellees reserving the lots for Hutchings. Each LRA contained the following language:

> All Parties acknowledge this is NOT an offer to purchase, but simply the right for Buyer to enter a [REPC] upon Buyer['s] acceptance of final price, and Seller completing the processes to begin construction.
>
> The terms of this [LRA] are as follows:
>
> Seller expressly agrees to reserve [each lot] for Buyer for a period of 90 days from the date of acceptance of the [LRA], during which time it is assumed both parties will execute a REPC for the purchase of the property.
>
> Upon execution of the REPC, the deposit shall be held as non-refundable earnest money and will be applied to Buyer['s] closing costs or down

payment of the property, under the terms of the REPC.

Buyer has no right or interest in the property in the interim period of time and Buyer shall be under no obligation to purchase the property until execution of the REPC.

In the event Buyer has not entered into a binding contract for the purchase of the property within 90 days, this [LRA] shall be terminated and the deposit shall be refunded in full to Buyer.

At any time Buyer may cancel this [LRA] by written notice and the $10,000 deposit will be fully refundable.

On February 9, 2021, Hutchings signed an amendment to each LRA that extended the 90-day deadline to June 30, 2021; these amendments were not signed by Appellees.

*Hutchings Helps Design the Homes, and the Sale of Lot 131 Closes*

¶8     Hutchings "provided to [Appellees] . . . a custom floor plan that [he] had already developed and wanted to use as the starting place for the builds on Lots 130 and 131," which "floor plan was not one of the options offered by" Appellees. He also spent "more than 100 hours" working with a licensed plan designer (Plan Designer), customizing a final plan for each home "and researching additional designs and amenities that could maximize the potential of Lot 130."

¶9     Hutchings and Plan Designer first focused their efforts on completing the plans for Lot 131. In June 2021, Lot 131's plans were finalized and construction could commence. On June 22, 2021, Hutchings's father executed a REPC for Lot 131 with a purchase price of $1,524,000. He ultimately closed on Lot 131 for

$1,833,234, which Hutchings asserts was "consistent with the June 4 [e]mail, the LRA, and the parties' performance," including "multiple upgrades and changes during construction."

*The Parties Disagree on Lot 130's Price, and Hutchings Sues*

¶10    Once the process with Lot 131 was well underway, Hutchings returned to the design and plans for Lot 130 until the design, customization, and plans for the Lot 130 build were substantially complete. In the fall of 2022, Appellees offered to enter into a REPC with Hutchings for Lot 130 for a price of $3,995,000. Hutchings elected not to execute a REPC for this purchase price. In March 2023, Appellees sent Hutchings a check for $10,000 to refund his deposit on Lot 130, which he declined to cash.

¶11    Instead, Hutchings sued Appellees in May 2023, asserting claims of breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and quiet title. Hutchings later amended his complaint to add claims of promissory estoppel and equitable estoppel. Appellees subsequently moved for summary judgment.

¶12    After a hearing, the district court granted summary judgment in favor of Appellees on all of Hutchings's claims. Specifically, the court concluded that "no contract for the purchase of Lot 130 exist[ed] because there was no offer [and] no acceptance" and because "no statute of fraud exception applie[d]." The court also concluded that Appellees were not unjustly enriched by Hutchings's efforts in the design process because Hutchings "contributed to the designs at his own risk because he signed an agreement explicitly stating that he had no rights in Lot 130 during the time he assisted with the designs." Moreover, the court determined that Hutchings could not "establish promissory estoppel because" the email Appellees sent on June 4 "d[id] not constitute a sufficiently clear and definite promise" and because Hutchings's "reliance on the same [was]

unreasonable given the subsequently executed [LRA] because it clearly disclaim[ed] any of [Hutchings's] rights in Lot 130." Finally, the court stated that "equitable estoppel may allow for a cause of action in insurances cases" but that it was not available in this case. Hutchings timely appealed.

ISSUES AND STANDARD OF REVIEW

¶13 Hutchings asserts that the district court erred in several parts of its summary judgment ruling.[2] "We review the district court's decision on summary judgment de novo." *Nassi v. Hatsis*, 2023 UT App 9, ¶ 19, 525 P.3d 117 (cleaned up).

ANALYSIS

¶14 A "court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "To determine whether a genuine factual dispute exists, we ask whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." *Arlington Mgmt. Assocs., Inc. v. Urology Clinic of Utah Valley, LLC*, 2021 UT App 72, ¶ 10, 496 P.3d 719 (cleaned up). "[I]n a summary judgment proceeding, all facts and the reasonable inferences to be made therefrom should be construed in a light favorable to the non-moving party." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 33, 235 P.3d 749.

¶15 Hutchings challenges the court's summary judgment ruling in four respects. First, he contends that the emails sent on June 4, 2020, formed a valid contract between the parties. Second, he argues that his actions satisfied the partial-performance

---

2. Hutchings does not appeal the dismissal of his quiet title claim.

exception to the statute of frauds. Third, he asserts that Appellees were unjustly enriched by his design contributions. Fourth, he argues that he sufficiently asserted claims of promissory and equitable estoppel. We consider each of Hutchings's arguments against summary judgment in turn, applying the foregoing standards.

## I. Whether the Parties Formed a Contract

¶16    Hutchings first asserts that the emails sent on June 4, 2020 (the June 4 emails) and his sending of the partially completed REPC nearly two weeks later created a contract between the parties. We disagree.

¶17    "Generally, formation of a contract requires an offer, an acceptance, and consideration." *Cea v. Hoffman*, 2012 UT App 101, ¶ 24, 276 P.3d 1178. "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to the bargain is invited and will conclude it." *Id.* (cleaned up). "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." *Id.* (cleaned up). "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Id.* ¶ 25 (cleaned up). The acceptance "must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Id.* (cleaned up). "An offeree's proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises unless the original offeror accepts it unconditionally." *Id.* (cleaned up). "Generally, a counteroffer operates as a rejection of the original offer," and "the offeree's power to accept the original offer is thereby terminated." *Id.* (cleaned up). Finally, "consideration is present when there is an act or promise given in exchange for the other party's promise." *Id.* ¶ 26 (cleaned up).

¶18　The June 4 emails did not form a contract between the parties because the emails did not contain an acceptance.[3] Again, in response to Appellees' June 4 email, Hutchings replied,

> Thanks for the info. We are very interested. Can you send the plat with dimensions so we understand that as well? Also. Assuming rooftop patio, fire pit, landscaping would be part of this price as well. We just need to add 50–60k for the pool depending on size, layout, etc.

Put simply, thanking someone for information and expressing interest does not constitute "unconditional[] assent" to an offer. *See id.* ¶ 25 (cleaned up). Instead, Hutchings's statements show that his attention was captured and that he wanted to continue pursuing communications that might lead to a contract. Moreover, Hutchings's reference to the rooftop patio, fire pit, and landscaping represents either a request for more information (illustrating that the terms in Appellees' email were not sufficiently definite to constitute an offer) or a counteroffer. *See id.* ¶ 24 ("For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." (cleaned up)); *id.* ¶ 25 ("Generally, a counteroffer operates as a rejection of the original offer. . . . The offeree's power to accept the original offer is thereby terminated." (cleaned up)). Because no reasonable factfinder could find that Hutchings's June 4 email constituted an acceptance, as a matter of law, there was no contract created by the June 4 emails.

¶19　Hutchings asserts, however, that the question of acceptance should not "focus[] exclusively on [his] immediate

---

3. The June 4 emails may not have contained an offer either because they arguably lacked definite and unambiguous terms. *See infra* ¶¶ 33–34. However, because we conclude that there was no acceptance, we need not determine whether there was an offer.

reply" but should also take into account "additional evidence of [his] intent," including his sending Appellees "a partially completed REPC that included pricing for Lots 130 and 131 consistent with the basic pricing structure in [Appellees'] June 4 [e]mail." We are not persuaded. The draft REPC Hutchings sent was not clear: the draft contained two different sales prices and said it was for Lot 131, while an attached addendum said it was for Lot 130. Moreover, the draft REPC said, "('Buyer') offers to purchase from . . . ('Seller') the Property described below." Thus, in any event, the document was an offer from Hutchings—not an acceptance—and therefore implicitly recognized that the parties had not yet formed a contract.

¶20   Our conclusion that the June 4 emails and Hutchings's sending of the partially completed REPC did not create a contract is further demonstrated by the terms of the LRA for Lot 130. The LRA clearly communicated that it was "NOT an offer to purchase, but simply the right for Buyer to enter a [REPC] upon Buyer['s] acceptance of final price, and Seller completing the processes to begin construction." Hutchings would have us take the LRA as signifying that the parties had already solidified an offer to purchase, but this supposition defies logic, contravenes the plain language of the LRA, and ignores the path to an actual contract the LRA outlined. First, as to logic, there would be no reason for the parties to sign the LRA if they had already entered into a purchase contract. Second, the LRA's plain language indicates in multiple ways that there was no previous purchase contract: the phrase "upon Buyer['s] acceptance of final price" clearly conveys that Hutchings had not yet accepted the final price, and the phrase "[i]n the event Buyer has not entered into a binding contract for the purchase of the property within 90 days" plainly recognizes that Hutchings had not yet entered into a purchase contract with

Appellees.[4] Third, Appellees "informed Hutchings that they had a particular process that they followed to formalize sales and begin construction," which involved "completing the design process, obtaining specific bids for construction costs, and finalizing those costs in a REPC." In other words, Appellees told Hutchings that an offer to purchase would come through a REPC, which would not be available until the design was completed and bids were obtained for construction costs.[5] And there is no factual dispute that Hutchings knew this process had not been completed.

¶21    Furthermore, the LRA stated, "Buyer has no right or interest in the property in the interim period of time." As Appellees aptly assert, "if [Hutchings] had believed that the June [e]mails created a binding agreement for the [p]urchase of Lot 130, [he] would never have agreed to the [LRA,] where[in] he acknowledged that he had no 'right or interest in the property.'" We agree. The LRA represented a clear communication that the

---

4. The LRA declared that if the parties did not enter into a purchase contract by the end of the ninety days, Appellees would refund Hutchings's $10,000 deposit. Appellees did not refund this money until March 2023. But Hutchings does not argue that this delay harmed him in any way. Thus, even if the delay violated the terms of the LRA, a breach of contract claim under the LRA also would not survive summary judgment.

5. Hutchings attempts to make much of the fact that Lot 131 was sold at a price that he claims aligned with Appellees' June 4 email. But he offers no evidence that in finalizing the REPC for Lot 131, the parties simply looked to Appellees' June 4 email and did not, instead, follow the path Appellees had spelled out, including Appellees informing Hutchings—after obtaining bids—of higher-than-anticipated construction costs and offering a purchase price reflective of those costs.

parties had not yet contracted for the purchase of Lot 130.[6] Instead, the LRA provided Hutchings with a right to enter into a purchase contract for Lot 130 by executing a REPC within the designated timeframe, which Hutchings did not do.

¶22    Ultimately, a factfinder could not reasonably infer that the parties formed a valid purchase contract for Lot 130 through the June 4 emails and Hutchings's later sending of the partially completed REPC. Accordingly, there was no purchase contract for Appellees to breach. Thus, the district court properly granted summary judgment on Hutchings's breach of contract claim and on his related claim for breach of the covenant of good faith and fair dealing, *see Vander Veur v. Groove Ent. Techs.*, 2019 UT 64, ¶ 20, 452 P.3d 1173 ("We have consistently rejected the notion of a free-standing implied covenant of good faith and fair dealing in the absence of a contract." (cleaned up)).

## II. Whether the Partial-Performance Exception to the Statute of Frauds Applied

¶23    Hutchings next argues that the district court erred in ruling that the partial-performance exception to the statute of frauds did not apply. Again, we disagree.

¶24    Contracts for the sale of land must be in writing. *See* Utah Code § 25-5-3. But "[u]nder the statute of frauds, an otherwise invalid agreement may be enforced through a court's equitable prerogatives if a party, relying on [an] oral agreement, partially performs its contractual obligations." *Jenkins v. Percival*, 962 P.2d 796, 801 (Utah 1998). This exception has three criteria: "(1) the oral contract and its terms are clear and definite, (2) the acts done in performing the contract are equally clear and definite, and (3) the

---

6. Hutchings notes that "[t]he LRAs have no integration clause or any other language suggesting that they are the entire, integrated agreements of the parties." While this is true, it does not transform the emails into a contract.

acts are in substantial reliance on the oral contract." *Id.* However, Hutchings has not pointed to any oral agreement that he could have partially performed. To the extent that he is arguing that he partially performed an agreement created by the parties' emails, we have already ruled that the emails did not constitute a contract. Thus, as to the emails, there was no agreement for him to partially perform. And to the extent that he is arguing that he partially performed the LRA for Lot 130, he has not alleged a breach of the LRA. Accordingly, Hutchings's partial performance argument is unavailing, and we affirm the district court's ruling to that effect.

### III. Whether Appellees Were Unjustly Enriched

¶25　Hutchings next contends that the district court erred in concluding that Appellees were not unjustly enriched. He asserts that the court "improperly viewed the facts and reasonable inferences therefrom in [Appellees'] favor." We agree that the court erred on this point.

¶26　"An unjust enrichment claim has three elements: (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Howard v. Manes*, 2013 UT App 208, ¶ 30, 309 P.3d 279 (cleaned up). And Hutchings produced evidence on each of these elements.

¶27　Hutchings produced a declaration wherein he stated that he "provided to [Appellees] . . . a custom floor plan that [he] had already developed," which "floor plan was not one of the options offered by" Appellees. In the same declaration, he asserted that he spent "more than 100 hours" working with Plan Designer, customizing the plans for both homes "and researching additional designs and amenities that could maximize the potential of Lot 130." Hutchings further declared that Appellees knew he worked

with Plan Designer on the home plans, and Appellees acknowledged that Hutchings made "various recommendations to [Plan Designer] to customize a potential build for Lot 130 after the LRAs were executed." Based on this evidence, Hutchings argues that a reasonable factfinder could find that he conferred a benefit on Appellees—of which they were aware—when they took his plans and design efforts and that it would be inequitable for Appellees to keep his plans and efforts without paying for their value.

¶28    Appellees resist Hutchings's argument by contending that because of the existence of the LRA, an unjust enrichment claim is not available to Hutchings. "Where an express contract covering the subject matter of the litigation exists, recovery for unjust enrichment is not available." *United States Fid. v. United States Sports Specialty*, 2012 UT 3, ¶ 13, 270 P.3d 464 (cleaned up). We acknowledge that the LRA formed a contract governing the terms of Hutchings's reservation of Lot 130. But the inquiry on this issue is not whether any contract between the parties existed; instead, "the central question bearing on the availability of an equitable remedy . . . is whether the [right at issue] is within the subject matter of the [contract], such that the [contract] is the exclusive authority that governs the rights and obligations of the parties relating to the conduct at issue." *Id.* ¶ 14 (cleaned up).

¶29    Here, the LRA did not say anything about Hutchings's provision of a floor plan or of him otherwise contributing to the design plans. In fact, in light of Appellees informing Hutchings that their process for formalizing sales prior to construction included "completing the design process," the LRA's reference to "Seller completing the processes to begin construction" wholly fails to contemplate Hutchings's involvement in the design process under the terms of the LRA. Therefore, the terms of Hutchings's involvement in the design process or the remedies available to him if Appellees benefited from his provision of a

plan or participation in the design process were not within the subject matter of the LRA. Moreover, the LRA's declaration that the buyer had "no right or interest in the property in the interim period of time" does not mean that Hutchings had no interest in the custom floor plan or the final home designs. Additionally, the LRA stated that it would automatically terminate if the parties did not enter a purchase contract within ninety days, and much of the time Hutchings says he spent on the design process for Lot 130 occurred after this deadline; the LRA does not govern or provide remedies for those efforts.

¶30 Appellees further respond that "any benefit for the plans was legally conferred by [Plan Designer]—not Hutchings"—because Appellees "purchased from [Plan Designer] the architectural designs and plans . . . for Lot 130," which plans bore Plan Designer's professional stamp. However, because there is evidence that Hutchings provided a custom plan to Appellees, that his unpaid labor was instrumental in developing that plan into a final design, and that Appellees were aware of these realities, there is a genuine factual dispute on the issue of whether Appellees were unjustly enriched.[7] While it is not certain that Hutchings will prevail on this claim, dismissal of the claim on summary judgment was improper. *See Arlington Mgmt. Assocs., Inc. v. Urology Clinic of Utah Valley, LLC*, 2021 UT App 72, ¶ 10, 496 P.3d 719 (stating that summary judgment is inappropriate where reasonable jurors "might come to different conclusions").

---

7. Appellees also impliedly argue that if Hutchings has an unjust enrichment claim, it is against Plan Designer. It may be that Hutchings has an unjust enrichment claim against Plan Designer, but that does not defeat, as a legal matter, Hutchings's claim against Appellees where Hutchings has provided evidence satisfying the elements of unjust enrichment against them.

IV. Whether Estoppel Is Appropriate

¶31 Finally, Hutchings asserts that the district court erred in granting summary judgment for Appellees on Hutchings's estoppel claims. Hutchings argues that the doctrines of both promissory estoppel and equitable estoppel apply here. We disagree.

A. Promissory Estoppel

¶32 "Promissory estoppel is an equitable claim for relief that compensates a party who has detrimentally relied on another's promise." *E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, ¶ 29, 336 P.3d 1077 (cleaned up). "The promise must be sufficiently clear and definite that the person making the promise should reasonably expect the other party to rely on it." *Id.* This requirement is not satisfied here.

¶33 Hutchings identifies the basis of his promissory estoppel claim as Appellees' purported promise in their June 4 email to "sell the lot and its build based on [the identified] price structure at a future date." Hutchings asserts that Appellees' June 4 email "established the base price for both lots and their builds, and the process for customizing each build, arriving at a final price, and finalizing the purchase." However, while this email stated that the base prices identified—$1,200,000 for Lot 130 and $1,320,000 for Lot 131—would increase based on the inclusion of a pool, it did not say anything about how any other upgrade or other variable, such as increased construction costs, would affect the final price. Therefore, it is not clear what Hutchings means when he says that this email established the process for arriving at the lots' final prices.

¶34 Nonetheless, Hutchings contends that "[w]hile the June 4 [e]mail did not state a final price, it did provide a clear method for calculating the price once the parties determined the cost of the upgrades and added those to the base price specified in the

email." (Internal quotation marks omitted.) In other words, even though the email said nothing about upgrades or any cost variable other than for a pool, Hutchings maintains that Appellees should have reasonably expected that Hutchings would rely on their June 4 email as providing a fixed (yet unstated) formula—namely, listed base price + pool cost + cost of additional upgrades—as the basis for determining a final sales price. We are simply unpersuaded, especially where—in the same email—Hutchings was still unclear as to whether features such as a rooftop patio, fire pit, and landscaping were even included in the listed base price. Instead, we conclude that Appellees' June 4 email did not contain a sufficiently clear and definite pricing formula that Appellees should have reasonably expected Hutchings to rely on that email as providing a definite formula for a final sales price for Lot 130.[8]

B.     Equitable Estoppel

¶35    Hutchings asserts that the doctrine of equitable estoppel also applies. "Our caselaw recognizes equitable estoppel and

---

8. Again, Hutchings places heavy emphasis on the successful sale of Lot 131 for his claim that the purported promise contained in Appellees' June 4 email was sufficiently clear and definite. But Hutchings identifies no evidence suggesting that the price used in the REPC for Lot 131 was the original base price + pool cost + cost of additional upgrades. Indeed, Hutchings's complaint alleged that in early 2021 Appellees "informed [him] that construction costs were increasing and that customization costs would add to the purchase price"; that he "understood the reality of increasing construction costs and promptly agreed to an increased base price for both lots and their builds"; and that "the new base price for Lot 131 and its build was [then] agreed to be roughly $1,524,000 instead of $1,320,000." These admissions by Hutchings bolster our conclusion that Appellees' June 4 email did not contain a promise that could support a promissory estoppel claim.

promissory estoppel as two distinct legal principles, one a defense and one a cause of action in most instances." *Youngblood v. Auto-Owners Ins. Co.*, 2007 UT 28, ¶ 12, 158 P.3d 1088. Hutchings disputes the district court's ruling that while "equitable estoppel may allow for a cause of action in insurance cases," it does not do so in this case. *See id.* ¶ 39 (holding that "[a] party may recover under the doctrine of estoppel" for misrepresentations made by insurance agents). But we recently explained in *Hammon v. Zoom Inc.*, 2026 UT App 106, that our supreme court in *Youngblood* made clear that an affirmative claim of equitable estoppel is "only appropriate for insurance coverage disputes," and we declined to extend the exception to other types of disputes. *Id.* ¶ 37. Like in *Hammon*, we decline to extend the exception here. *See id.*

CONCLUSION

¶36 The June 4 emails and the partially completed REPC sent later by Hutchings did not form a contract between the parties, and the partial performance exception to the statute of frauds did not apply. Thus, the district court properly granted summary judgment on Hutchings's contract-based claims. Summary judgment was also appropriate on his estoppel claims. However, the court erred in granting summary judgment on his unjust enrichment claim, and we therefore reverse and remand this matter for proceedings related to that claim.

―――――――